Filed 9/20/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079237 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD193832) |
| FRANK ELI HEARD, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, John M. Thompson, Judge. Reversed and remanded with instructions.

Eric R. Larson under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Steve Oetting Assistant Attorney General, Melissa Mandel and Nora S. Weyl, Deputy Attorneys General for Plaintiff and Respondent.

INTRODUCTION

Frank Eli Heard is serving a sentence of 23 years plus 80 years to life for two counts of attempted willful, deliberate and premeditated murder for a drive-by shooting he committed at age 15, and one count of voluntary

manslaughter for a homicide he committed just after he turned 16. After 15 years of incarceration, he petitioned the trial court to recall his sentence and resentence him to a lesser sentence under Penal Code[1] section 1170, former subdivision (d)(2) (now subdivision (d)(1)). Under this provision, a juvenile offender who "was sentenced to imprisonment for life without the possibility of parole" and has been incarcerated for at least 15 years "may submit to the sentencing court a petition for recall and resentencing." (§ 1170, former subd. (d)(2)(A)(i), now subd. (d)(1)(A).) The trial court denied Heard's petition, finding him ineligible for relief because he was not sentenced to an explicitly designated term of life without the possibility of parole.[2]

Heard appeals, presenting two issues of first impression. First, he asserts the resentencing provision should be interpreted to apply not only to juvenile offenders sentenced to explicitly designated terms of life without parole, but also to a juvenile offender, like him, who have been sentenced to multiple terms that are the functional equivalent of life without parole. Second and alternatively, Heard asserts a contrary interpretation of the resentencing provision would violate his constitutional right to equal protection of the laws. We reject his first contention. Instead, we interpret section 1170, subdivision (d)(1)(A), to limit eligibility to petition for recall and resentencing to juvenile offenders sentenced to explicitly designated life without parole terms. But we conclude denying juvenile offenders, who were sentenced to the functional equivalent of life without parole, the opportunity

---

[1] Further unspecified statutory references are to the Penal Code.

[2] For brevity, we subsequently refer to life without the possibility of parole as "life without parole."

to petition for resentencing violates the guarantee of equal protection.  We therefore reverse the trial court's order and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Heard's Convictions and Sentence*[3]

In January 2005, when Heard was 15 years old, he and three fellow members of the West Coast Crips gang were riding in a car when the front passenger shot at a group of rival Blood gang members on the street.  In the volley of bullets, two persons were injured, but not killed.  Heard admitted to the police he was in possession of a gun at the time of the shooting.  When the gun was recovered, it had Heard's fingerprints on it and was determined to have fired shell casings recovered from the crime scene.  The evening of the shooting, Heard bragged to a friend that he "got a slob," which is a derogatory term for a Blood.  In a videotape of a party, made a few days before the

---

[3]    Our summary of the underlying factual and procedural background is taken in part from two prior decisions of this court.  (*People v. Heard* (Feb. 24, 2009, D052492) [nonpub. opn.]; *In re Heard* (2014) 223 Cal.App.4th 115, review granted April 30, 2014, S216772, matter transferred Aug. 17, 2016, judg. vacated and cause remanded Sept. 12, 2016, D063181.)  Although *People v. Heard* is an unpublished opinion, and our published opinion in *In re Heard* was subsequently vacated, we may appropriately rely on them for information about the background of this case.  Both opinions were submitted to the trial court as exhibits to Heard's recall and resentencing petition, and on January 13, 2022, this court granted Heard's unopposed request for judicial notice of both opinions as well as the docket in case number D063181 pursuant to California Rules of Court, rule 8.252(a), and Evidence Code sections 452, subdivision (d), and 459.  (See, e.g., *Pacific Gas & Electric Co. v. City and County of San Francisco* (2012) 206 Cal.App.4th 897, 907, fn. 10 [observing it was appropriate for the appellate court to cite an unpublished decision "to explain the factual background of the case and not as legal authority"]; accord, *Conrad v. Ball Corp.* (1994) 24 Cal.App.4th 439, 443, fn. 2.)

shooting, Heard was holding what appeared to be the same gun used in the shooting and performing a rap song that glorified a prior killing of Bloods.

In July 2005, less than two weeks after Heard turned 16, witnesses saw him and others walk up to a young man standing on a street corner. After exchanging words with the man, Heard pulled out a handgun and shot him in the head, killing him. It was later determined that Heard believed the victim was on the street corner selling drugs in his gang's territory.[4]

Heard was charged with two counts of attempted willful, deliberate and premeditated murder (§§ 664, 187, subd. (a); counts 1 and 2), and one count of murder (§ 187, subd. (a); count 3). Each offense was alleged to have been committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and with the personal use of a firearm (§ 12022.53, subds. (c), (d), & (e)(1)). Count 3 was severed and Heard went to a jury trial on counts 1 and 2. The jury found him guilty of both counts of attempted murder as charged and found true the firearm use and gang allegations. Heard then entered a plea agreement on count 3, in which he pled guilty to the lesser included offense of voluntary manslaughter (§ 192, subd. (a)) and admitted a gang enhancement allegation (§ 186.22, subd. (b)(1)), as well as a firearm enhancement (§ 12022.5, subd. (a)).

Heard's sentencing hearing took place in January 2008. In a sentencing memorandum filed before the hearing, Heard argued the imposition of a life sentence would be cruel and unusual punishment in violation of the Eighth Amendment. He urged the court to consider his youth and capacity to mature and change, limited intelligence, and that he was

---

[4]    Our description of this homicide is taken from the probation report, which was included in the clerk's transcript for this appeal.

introduced to criminal street gangs as a toddler, when making its sentencing decision. At the sentencing hearing, Heard's trial counsel continued to maintain that it would be unconstitutional to sentence Heard to prison for life.

The trial court disagreed. It found there was "no constitutional infirmity for the imposing of a life sentence for an attempted premeditated murder," and that the Legislature had approved prosecuting juveniles as adults in response to an increase in acts of gang violence by juvenile gang members. The court stated Heard was the "poster child for the legislative intervention with regard to gangs." It concluded there was "no constitutional infirmity in the application of either a life sentence as to the counts or . . . life sentences as to the enhancements." The court then sentenced Heard to a total prison term of 23 years plus 80 years to life.[5]

Heard appealed his attempted murder convictions, and this court affirmed the judgment in 2009. (*People v. Heard*, *supra*, D052492, review denied May 20, 2009, S171378.) Heard filed a petition for a writ of habeas corpus with the superior court, claiming his prison sentence was excessive because he would not be eligible for parole during his lifetime. The superior court denied the petition. Heard then filed a petition for a writ of habeas corpus with this court in 2012, raising again the argument that his sentence

---

[5] On counts 1 and 2, Heard was sentenced to 15 years to life on each attempted premeditated murder and a consecutive 25 years to life for the firearm under section 12022.53, subdivision (d), on each offense. The total term on both counts was 80 years to life. On count 3, Heard was sentenced to nine years for the voluntary manslaughter, plus four years for the firearm under section 12022.5, subdivision (a), another 10 years for the gang enhancement under section 186.22, for a total determinate term of 23 years. The court elected to run the sentences for counts 1, 2, and 3 consecutively.

was excessive. As we later discuss in further detail, in January 2014, we granted the petition and remanded the case for resentencing. (*In re Heard*, *supra*, D063181.) In the intervening years since Heard was sentenced in 2008, a sea change in juvenile sentencing law had occurred, beginning with the United States Supreme Court's decision in *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*). We discuss those changes in juvenile sentencing law next, before returning to the procedural history of Heard's case.

II.

*Changes in Juvenile Sentencing Law*

A.    *Decisional Law*

Beginning with *Roper* in 2005, the United States Supreme Court held the Eighth Amendment categorically bars imposition of the death penalty on offenders who were under 18 when their crimes were committed. (*Roper*, *supra*, 543 U.S. at pp. 578–579.) In a series of decisions that followed, the United States Supreme Court and California Supreme Court placed further limits on the punishment that may constitutionally be imposed on juvenile offenders. These decisions arose in large part from advances in research on adolescent brain development, and the related, growing recognition that juveniles "have diminished culpability and greater prospects for reform" and are therefore "constitutionally different from adults for purposes of sentencing." (*Miller v. Alabama* (2012) 567 U.S. 460, 471 (*Miller*), discussing *Roper*, *supra*, 543 U.S. 551 and *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*).)

Five years after *Roper*, the United States Supreme Court held in *Graham* the Eighth Amendment categorically bars the imposition of a sentence of life without parole on a juvenile offender who did not commit homicide. (*Graham*, *supra*, 560 U.S. at p. 82.) The *Graham* court observed:

6

"As compared to adults, juveniles have a ' "lack of maturity and an underdeveloped sense of responsibility" '; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.' [Citation.] These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citation.] Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.' " (*Id.* at p. 68.)

The *Graham* court further observed that life without parole is " 'the second most severe penalty permitted by law' " and it is "an especially harsh punishment for a juvenile [offender]," who "will on average serve more years and a greater percentage of his life in prison than an adult offender." (*Graham*, *supra*, 560 U.S. at pp. 69, 70.) It "likened a life without parole sentence for nonhomicide [juvenile] offenders to the death penalty itself, given their youth and the prospect that, as the years progress, juveniles can reform their deficiencies and become contributing members of society." (*People v. Caballero* (2012) 55 Cal.4th 262, 266 (*Cabellero*), citing *Graham*, at pp. 69–70.) To avoid violating the Eighth Amendment, the high court held that states "need not guarantee the [nonhomicide] offender eventual release" but must provide "some realistic opportunity to obtain release." (*Graham*, at p. 82.)

In *Miller*, the United States Supreme Court extended *Graham*'s reasoning to homicide cases and held the Eighth Amendment forbids sentencing schemes that make life without parole the mandatory punishment for a juvenile convicted of homicide. (*Miller*, *supra*, 567 U.S. at p. 489.) The

7

Court reaffirmed that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." (*Id.* at p. 472.) It explained that "mandatory penalty schemes . . . remov[e] youth from the balance" and "prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender. That contravenes *Graham*'s (and also *Roper*'s) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." (*Id.* at p. 474.)

The *Miller* court did not extend *Graham*'s categorical ban to homicide cases and foreclose life without parole terms for juvenile homicide offenders, but it held the sentencing court must have discretion to impose a lesser sentence. (*Miller, supra,* 567 U.S. at p. 480.) The Court outlined mitigating factors relating to youth that must be considered by the sentencing court before committing a juvenile to prison for life without parole,[6] and cautioned

---

[6]     These factors are: "(1) 'a juvenile offender's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences" '; (2) ' "the family and home environment that surrounds [the juvenile]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional" '; (3) ' "the circumstances of the homicide offense, including the extent of [the juvenile defendant's] participation in the conduct and the way familial and peer pressures may have affected him" '; (4) 'whether the offender "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth— for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys" '; and (5) ' "the possibility of rehabilitation." ' " (*In re Kirchner* (2017) 2 Cal.5th 1040, 1054 (*Kirchner*).)

that the "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon."[7] (*Id.* at pp. 477–479.)

In *Caballero*, the California Supreme Court held that an aggregate 110-year-to-life sentence imposed on a juvenile convicted of nonhomicide offenses contravenes *Graham*'s mandate against cruel and unusual punishment under the Eighth Amendment. (*Caballero*, *supra*, 55 Cal.4th at pp. 265, 268–269.) In so holding, our high court rejected the People's claim that "a cumulative sentence for distinct crimes does not present a cognizable Eighth Amendment claim" because each individual sentence included the possibility of parole within the juvenile offender's lifetime. (*Id.* at p. 267.) The juvenile offender in *Caballero* was convicted of three counts of attempted murder, committed for the benefit of a criminal street gang and with the personal use of a firearm. (*Id.* at p. 265.) The Court observed the juvenile "will become parole eligible over 100 years from now." (*Id.* at p. 268 [explaining that under section 3046, subdivision (b), the defendant would be required to serve a minimum of 110 years before becoming parole eligible].) The Court called this a "term-of-years sentence that amounts to the functional equivalent of a life without parole sentence." (*Caballero,* at p. 268.) It then concluded that under *Graham*, "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile

---

7    In *Montgomery v. Louisiana* (2016) 577 U.S. 190, 212 (*Montgomery*), the Court held the holding of *Miller* was retroactive because it announced a substantive rule of constitutional law. The *Montgomery* court also held that states could remedy *Miller* error—that is, sentencing a juvenile to life without parole without considering the youth-related mitigating factors outlined in *Miller* (see footnote 6, *ante*)—by giving juvenile homicide offenders parole hearings, rather than resentencing them. (*Montgomery*, at p. 212.)

9

offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*Caballero,* at p. 268.)

B.     *Statutory Law*

As decisional law on the punishment of juvenile offenders was developing, the Legislature enacted two provisions that are relevant to this case.

1.     *Senate Bill No. 9 (2011–2012 Reg. Sess.) (Senate Bill 9) Adds Former Subdivision (d)(2), Now Subdivision (d)(1), to Section 1170*

Effective January 1, 2013, Senate Bill 9 added former subdivision (d)(2) to section 1170. (See Stats. 2012, ch. 828, § 1.) Senate Bill 9 "was introduced in the Legislature after *Graham*, but before *Miller*" and "was inspired by concerns regarding sentences of life without parole for juvenile offenders." (*Kirchner*, *supra*, 2 Cal.5th at p. 1049.) It created "a procedural mechanism for resentencing of defendants who were under the age of 18 at the time of the commission of their offenses and who were given [life without parole] sentences." (*People v. Willover* (2016) 248 Cal.App.4th 302, 310.) Under this provision, "[w]hen a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has been incarcerated for at least 15 years, the defendant may submit to the sentencing court a petition for recall and resentencing." (§ 1170, former subd. (d)(2)(A)(i), now subd. (d)(1)(A).)

In the petition, "the defendant must describe his or her remorse, relate his or her work toward rehabilitation, and state that a qualifying circumstance is true." (*Kirchner*, *supra*, 2 Cal.5th at pp. 1049–1050.) The qualifying circumstances are (1) the defendant "was convicted pursuant to felony murder or aiding and abetting murder provisions of law"; (2) the

10

defendant does not have juvenile felony adjudications for assault or other violent felonies prior to the offense that resulted in the sentence being considered for recall; (3) the defendant committed the offense with at least one adult codefendant; or (4) the defendant has performed acts that tend to indicate rehabilitation or the potential for rehabilitation. (§ 1170, former subd. (d)(2)(B)(i)–(iv), now subd. (d)(1)(A)–(D).) "If the court finds by a preponderance of the evidence that one or more of the qualifying circumstances in the petition are true, the court must recall the defendant's sentence and hold a hearing to resentence the defendant." (*Kirchner*, at p. 1050.)

At the resentencing hearing, the court is permitted to consider factors enumerated in the statute, along with " 'any other criteria that the court deems relevant to its decision.' " (*Kirchner*, *supra*, 2 Cal.5th at p. 1050.) "Upon conducting this assessment, '[t]he court shall have the discretion to resentence the defendant in the same manner as if the defendant had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' " (*Ibid.*) If the sentence is not recalled or the defendant is resentenced to imprisonment for life without the possibility of parole, the defendant may submit another petition for recall and resentencing after 20 and 24 years of incarceration. (§ 1170, former subd. (d)(2)(H), now subd. (d)(10).)

In *Kirchner*, the California Supreme Court held this statutory resentencing procedure is not adequate to cure *Miller* error. (*Kirchner*, *supra*, 2 Cal.5th at pp. 1043, 1052–1056.) The Court explained the procedure was "originally . . . developed prior to the decision in *Miller*, . . . was not designed to provide a remedy for this type of error, and . . . is not well suited to serve this purpose." (*Id.* at p. 1052.) It further explained the procedure

11

"provides only a selective and qualified remedy, the application of which is ultimately premised on an inquiry that may, but does not necessarily, overlap with the one demanded under *Miller*."  (*Id.* at pp. 1054–1055.)

Since its original enactment, former subdivision (d)(2) of section 1170 has been modified, but the modifications are relatively minor.  Relevant to this appeal, the provision that specifies which defendants are eligible to file a petition for recall and resentencing (§ 1170, former subd. (d)(2)(A)(i), now subd. (d)(1)(A)) has not been changed.  Effective January 1, 2022, subdivision (d)(2) of section 1170 was redesignated as subdivision (d)(1) of section 1170.  (Stats. 2021, ch. 731, § 1.3.)

2.	*Senate Bill No. 260 (2013-2014 Reg. Sess.) (Senate Bill 260)*

Effective January 1, 2014, Senate Bill 260 added sections 3051, 3046, subdivision (c), and 4801, subdivision (c), to the Penal Code.  (Stats. 2013, ch. 312, §§ 3, 4 & 5; see *People v. Franklin* (2016) 63 Cal.4th 261, 276–277 (*Franklin*) [discussing this history].)  Senate Bill 260 was passed "explicitly to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*."  (*Franklin*, at p. 277.)

"At the heart of [Senate Bill 260] was the addition of section 3051, which requires the Board [of Parole Hearings (Board)] to conduct a 'youth offender parole hearing' during the 15th, 20th, or 25th year of a juvenile offender's incarceration.  [Citation.]  The date of the hearing depends on the offender's ' "[c]ontrolling offense," ' which is defined as 'the offense or enhancement for which any sentencing court imposed the longest term of imprisonment.' "  (*Franklin*, *supra*, 63 Cal.4th at p. 277.)  As originally enacted, section 3051 created a schedule of youth offender parole hearings for juvenile offenders sentenced to a determinate term, a life term of less than 25

12

years to life, or a life term of 25 years to life.[8] (Stats. 2013, ch. 312, § 4; § 3051, subd. (b)(1)–(3).)

In *Franklin*, the California Supreme Court considered the effect of Senate Bill 260 on a juvenile's claim of *Miller* error. The defendant in *Franklin* was 16 years old when he shot and killed another teenager. (*Franklin*, *supra*, 63 Cal.4th at p. 269.) He was convicted of first degree murder with a corresponding firearm enhancement, for which he received two consecutive 25-year-to-life terms. (*Id.* at p. 271.) Our high court held "just as *Graham* applies to sentences that are the 'functional equivalent of a life without parole sentence' [citation], so too does *Miller* apply to such functionally equivalent sentences." (*Id.* at p. 276.) The Court went on to find, however, that Senate Bill 260 mooted the defendant's Eighth Amendment challenge to his sentence under *Miller*. It explained that although the defendant remained bound by his original sentence, by operation of Senate Bill 260, the defendant "is now serving a life sentence that includes a meaningful opportunity for release during his 25th year of incarceration. Such a sentence is neither [life without parole] nor its functional equivalent. Because [the defendant] is not serving [a life without parole] sentence or its functional equivalent, no *Miller* claim arises here." (*Franklin*, at pp. 279–280.)

---

[8] Section 3051 originally excluded juvenile offenders sentenced to life without parole from receiving youth offender parole hearings. (See *Franklin*, *supra*, 63 Cal.4th at p. 278.) After the California Supreme Court held in *Kirchner*, *supra*, 2 Cal.5th 1040 that section 1170, former subdivision (d)(2), was inadequate to cure *Miller* error, the Legislature amended section 3051 to provide youth offender parole hearings to juvenile offenders sentenced to life without parole. (See § 3051, subd. (b)(4), added by Stats. 2017, ch. 684, § 1.5.)

At the same time, our high court recognized the defendant's sentencing hearing may have resulted in a record that was "incomplete or missing mitigation information [relating to his youth]" because such information was not considered relevant at the time he was sentenced. (*Franklin*, *supra*, 63 Cal.4th at pp. 282–283.) Accordingly, it remanded the matter for the trial court to determine "whether [the defendant] was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing," and, if not, to hold a hearing at which the parties could present evidence bearing on "youth-related factors" for later consideration by the Board. (*Id.* at p. 284.) This hearing is now commonly referred to as a *Franklin* proceeding. (See *In re Cook* (2019) 7 Cal.5th 439, 450.)

Against this backdrop of changes in juvenile sentencing law, we return to Heard's petition for writ of habeas corpus.

III.

*Heard's Petition for Writ of Habeas Corpus*

As noted, in December 2012, Heard filed a petition for writ of habeas corpus with this court in which he argued his sentence was excessive under the Eighth Amendment. In January 2014, we granted the petition and remanded the case for resentencing. (*In re Heard*, *supra*, D063181.) Relying on *Graham*, *Miller*, and *Caballero*, we held Heard's sentence was "a de facto life [without parole] sentence," the majority of which was attributable to nonhomicide offenses, and it therefore violated the Eighth Amendment. (*Ibid.*) Lacking the benefit of *Montgomery* and *Franklin*, we rejected the People's contention that Heard's eligibility for a parole hearing under section 3051 negated the need for resentencing.

14

The People petitioned for review with the California Supreme Court. In April 2014, the Court granted the petition and deferred action pending the resolution of two other cases (*In re Alatriste*, S214652, and *In re Bonilla*, S214960). In May 2016, while Heard's case was still pending, the California Supreme Court decided *Franklin, supra*, 63 Cal.4th 261. In August, our high court transferred Heard's case to this court with directions to vacate our January 2014 disposition and to issue an order to show cause to the secretary of the California Department of Corrections and Rehabilitation (Department of Corrections), returnable to the superior court, why Heard was not entitled to make a record of " 'mitigating evidence tied to his youth.' ([*Franklin, supra*, 63 Cal.4th at pp. 268–269, 283–284].)" In September 2016, we vacated our opinion in case number D063181 and issued an order to show cause as directed.[9]

Heard received his *Franklin* proceeding in August 2017. After reviewing documents submitted by Heard and the People, the trial court determined it had not received all relevant mitigating evidence at the sentencing hearing.[10] The court ordered the parties' documents to be filed with the court under seal and submitted to the Department of Corrections.

---

[9] Because this opinion was vacated, it has no effect as law of the case. (See *Crossroads Investors, L.P. v. Federal National Mortgage Assn.* (2017) 13 Cal.App.5th 757, 773.)

[10] On our own motion, we take judicial notice of the trial court's order, which appears on the docket in case number D063181 and is part of our file in that case. (Evid. Code, §§ 452, subd. (d)(1), 459, subd. (a); see *Forbes v. County of San Bernardino* (2002) 101 Cal.App.4th 48, 50–51.)

IV.

*Heard's Petition for Recall and Resentencing*

In March 2021, Heard filed in the trial court a petition for recall and resentencing under section 1170, former subdivision (d)(2)(A). He asserted he was eligible to petition for resentencing because his sentence was a de facto life without parole sentence. He claimed he also met the other statutory criteria for resentencing, including that he had been incarcerated for over 15 years, was 15 years old when he committed the attempted murders, and his co-defendant was an adult at the time of these offenses.[11] Citing exhibits attached to his petition, he also asserted that he was no longer an active gang member, had completed multiple self-help and educational programs in prison, and was working as a mentor to younger inmates.

On June 28, 2021, in a written order, the trial court denied Heard's petition on the ground that he was statutorily ineligible to petition for resentencing. The court reasoned that resentencing under section 1170, former subdivision (d)(2)(A)(i), was specifically made available only to those defendants "sentenced to imprisonment for LWOP" (i.e., life without parole), and Heard "was not sentenced to imprisonment for LWOP." Heard appealed the trial court's order.[12]

---

[11] Wade Thomas Mills III, an adult, was in the car with Heard during the drive-by-shooting. He was found in possession of a gun at the time of the shooting, and his gun was also determined to have fired shell cases recovered from the crime scene. He was charged and tried with Heard on the attempted murders in counts 1 and 2, but the jury deadlocked as to Mills on both charges, and the court declared a mistrial as to Mills's case.

[12] The People do not dispute that the trial court's order is an appealable order. (See § 1237, subd. (b) [postconviction orders implicating a defendant's "substantial rights" are appealable]; *Gray v. Superior Court* (2016) 247

DISCUSSION

Heard challenges the trial court's determination that he is ineligible to petition for recall and resentencing on two grounds that present matters of first impression. First, he contends section 1170, subdivision (d)(1),[13] should be interpreted to apply to juvenile offenders sentenced to the functional equivalent of life without parole. Second, he contends that a contrary interpretation of section 1170, subdivision (d)(1), would violate his constitutional right to equal protection of the laws. Here, we reject Heard's interpretation of section 1170, subdivision (d)(1), but we agree with him that denying juvenile offenders sentenced to the functional equivalent of life without parole the opportunity to petition for resentencing under this provision violates the constitutional guarantee of equal protection of the laws.

I.

*Section 1170, Subdivision (d)(1), Limits Eligibility to Petition for*
*Resentencing to Juvenile Offenders Sentenced to Actual Life Without Parole*

Heard's first contention presents an issue of statutory interpretation that we consider de novo. (See *People v. Prunty* (2015) 62 Cal.4th 59, 71.) "[O]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose." (*People v. Murphy* (2001) 25 Cal.4th 136, 142.)

---

Cal.App.4th 1159, 1164 ["It is plain that a defendant's 'substantial rights' include personal liberty interests."].)

13    As we have mentioned, former subdivision (d)(2) of section 1170 was recently redesignated as subdivision (d)(1) of section 1170. (Stats. 2021, ch. 731, § 1.3.) This change took effect on January 1, 2022, while this appeal was pending. (See *ibid.*) Although the parties' appellate briefs refer to this provision by its former designation, we will generally refer to the provision (and the parties' arguments about the provision) using its current designation.

"Statutory construction begins with the plain, commonsense meaning of the words in the statute, ' "because it is generally the most reliable indicator of legislative intent and purpose." ' " (*People v. Manzo* (2012) 53 Cal.4th 880, 885.)  A statute is not to be read in isolation, but construed in context and " 'with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' " (*Landrum v. Superior Court* (1981) 30 Cal.3d 1, 14.)  " 'If there is no ambiguity or uncertainty in the language, the Legislature is presumed to have meant what it said, and we need not resort to legislative history to determine the statute's true meaning.' " (*People v. Skiles* (2011) 51 Cal.4th 1178, 1185.)

In ruling that Heard was ineligible to petition for recall and resentencing, the trial court relied on section 1170, subdivision (d)(1)(A), which states:  "When a defendant who was under 18 years of age at the time of the commission of *the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole* has been incarcerated for at least 15 years, the defendant may submit to the sentencing court a petition for recall and resentencing."  (Italics added.)

The question is whether this provision, and in particular the italicized text, refers only to defendants sentenced to an explicitly designated term of life without parole, or whether it includes defendants sentenced to multiple terms that in the aggregate constitute the functional equivalent of life without parole.  Two aspects of the statutory text suggest eligibility to petition for resentencing is limited to defendants sentenced to an explicitly designated term of life without parole.

First, the phrase "life without the possibility of parole" denotes a specific sentence and is used elsewhere in the Penal Code to specify that punishment as distinct from other punishments.  For example, section 190.5,

18

subdivision (b), provides: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for *life without the possibility of parole* or, at the discretion of the court, 25 years to life." (Italics added.) Similarly, section 3051, subdivision (b), which makes the timing of youth offender parole hearings contingent on the offender's longest term of imprisonment (§ 3051, subd. (a)(2)(B)), has separate provisions that create different parole hearing eligibility dates depending on whether the offender's longest term of imprisonment is "a determinate sentence" (§ 3051, subd. (b)(1)), "a life term of less than 25 years to life" (§ 3051, subd. (b)(2)), "a life term of 25 years to life" (§ 3051, subd. (b)(3)), or "*life without the possibility of parole*" (§ 3051, subd. (b)(4), italics added).

Second, section 1170, subdivision (d)(1)(A), uses the singular when referring to "*the offense* for which the defendant was sentenced to imprisonment for life without the possibility of parole." (§ 1170, subd. (d)(1)(A), italics added.) For a single offense to result in a life without parole sentence, the sentence must be one of an explicitly designated life without parole. The functional equivalent of life without parole results only when a defendant receives *multiple sentences for multiple offenses*, or an offense plus one or more enhancements, that add up to a lifelong prison commitment with no realistic opportunity for release. (See, e.g., *Caballero, supra,* 55 Cal.4th at pp. 265, 268–269 [sentence of 110 years to life for three counts of attempted murder plus corresponding firearm enhancements was the functional equivalent of life without parole]; *People v. Contreras* (2018) 4 Cal.5th 349,

19

356–357, 369 (*Contreras*) [two juveniles sentenced to aggregate terms of 50 years to life and 58 years to life imposed for multiple kidnapping offenses and multiple sexual offenses; held, these sentences were the functional equivalent of life without parole].)  The use of the singular when referring to "the offense for which the defendant was sentenced" suggests the Legislature meant an explicitly designated life without parole sentence.  (§ 1170, subd. (d)(1)(A).)

Accordingly, the text of the statute does not support Heard's interpretation of it.  And even if we were to find ambiguity in the statute's text, its legislative history also fails to assist Heard.  As *Kirchner* explained, Senate Bill 9 "was inspired by concerns regarding sentences of life without parole for juvenile offenders." (*Kirchner*, *supra*, 2 Cal.5th at p. 1049, citing Assem. Com. on Appropriations, Analysis of Sen. Bill 9, as amended Aug. 15, 2011, pp. 3–5.)  Although case law has since made clear these concerns apply to offenders sentenced to an explicitly designated life without parole term as well as terms that are functionally equivalent to life without parole, this case law was still nascent when Senate Bill 9 was introduced.  Virtually every legislative committee analysis of Senate Bill 9 observed that section 190.5, subdivision (b), permitted juvenile offenders to be sentenced to life without parole for special circumstances murder; other sentencing provisions were not discussed.  (See, e.g., Sen. Com. on Public Safety, Analysis of Sen. Bill 9, as introduced Dec. 6, 2010, p. 3; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill 9, as introduced, pp. 2–3; Assem. Com. on Public Safety, Analysis of Sen. Bill 9, as amended May 27, 2011, pp. 5–6, 9; Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill 9, as amended July 2, 2012, p. 2.)  Thus, contemporaneous analyses of Senate Bill 9 tend to show the Legislature, in enacting the resentencing

provision, was focused only on creating a remedy for juveniles sentenced to an explicitly designated life without parole term.

The interplay between the relief afforded by Senate Bill 9 and the relief afforded by Senate Bill 260 provides further support for the conclusion that Senate Bill 9 was intended for juvenile offenders sentenced to an explicitly designated life without parole term. As we have discussed, Senate Bill 260, which created section 3051, was explicitly passed "to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*." (*Franklin*, *supra*, 63 Cal.4th at p. 277.) And yet as originally enacted, section 3051 provided youth offender parole hearings only to juveniles whose lengthiest sentence was (1) a determinate sentence, (2) "a life term of less than 25 years to life," or (3) "a life term of 25 years to life." (See § 3051, subd. (b)(1)–(3), added by Stats. 2013, ch. 312, § 4.) It was only after the California Supreme Court held in *Kirchner*, *supra*, 2 Cal.5th 1040 that section 1170, former subdivision (d)(2), now subdivision (d)(1), was inadequate to cure *Miller* error, that the Legislature amended section 3051 to provide youth offender parole hearings to juvenile offenders sentenced to "life without the possibility of parole." (See § 3051, subd. (b)(4), added by Stats. 2017, ch. 684, § 1.5.) This history, too, demonstrates the resentencing provision was intended for juvenile offenders sentenced to explicitly designated life without parole terms, with section 3051 initially serving as a complementary provision that provided relief only to other juvenile offenders.

All of these considerations lead to the conclusion that eligibility under section 1170, subdivision (d)(1)(A), to petition for recall and resentencing is limited to juvenile offenders sentenced to an explicitly designated life without parole term. Heard offers two reasons why we should construe the statute differently. First, he contends we should "view[ ]" the statute against the

21

"legal landscape" pertaining to juvenile sentencing—a landscape that includes *Miller*, *Franklin*, and *Kirchner*. He essentially asks us to read section 1170, subdivision (d)(1), as though it embodied the principles articulated in these decisions even though it was introduced after them. We are not free to construe a statute so liberally that we change its intended meaning. "[W]e may not ' " ' "rewrite a statute to make it express an intention not expressed therein" ' " ' or one that may be derived from its legislative history." (*People v. Hobbs* (2007) 152 Cal.App.4th 1, 5.) "We do not sit as a 'super Legislature.' " (*People v. Flores* (2014) 227 Cal.App.4th 1070, 1074.)

Second, Heard contends we should construe section 1170, subdivision (d)(1), so as to avoid an absurd result. The absurd result being that a juvenile sentenced to terms amounting to de facto life without parole is not eligible to petition for resentencing, when a juvenile sentenced to actual life without parole is eligible to petition for resentencing. We disagree this circumstance warrants invoking the absurdity exception of statutory construction. Under the absurdity doctrine, "[a] court is not required to follow the plain meaning of a statute when to do so would frustrate the manifest purpose of the legislation as a whole or otherwise lead to absurd results. [Citations.] However, the absurdity exception requires much more than showing that troubling consequences may potentially result if the statute's plain meaning were followed or that a different approach would have been wiser or better. . . . Moreover, our courts have wisely cautioned that the absurdity exception to the plain meaning rule 'should be used most sparingly by the judiciary and only in extreme cases else we violate the separation of powers principle of government.' " (*Switzer v. Wood* (2019) 35 Cal.App.5th 116, 129.) It is not unusual for resentencing provisions to

22

exclude categories of offenders. (See *People v. Gonzalez* (2021) 65 Cal.App.5th 420, 434 [identifying examples of such provisions].) Interpreting section 1170, subdivision (d)(1)(A), to limit eligibility for resentencing to juveniles sentenced to an explicitly designated life without parole term is not a consequence so extreme that it qualifies as absurd. (Cf. *People v. Morris* (1988) 46 Cal.3d 1, 15 [applying the absurdity doctrine to avoid construing section 190.4 to require that the robbery underlying a felony murder must be separately charged as an independent substantive offense, lest the statute of limitations applicable to the robbery operate as a bar to the felony murder, which has no statute of limitations], disapproved on other grounds by *In re Sassounian* (1995) 9 Cal.4th 535, 543–545.)

For all of these reasons, we conclude section 1170, subdivision (d)(1)(A), limits eligibility to petition for recall and resentencing to juvenile offenders sentenced to an explicitly designated life without parole term. The trial court's interpretation of the statute was correct, and it did not err in denying Heard's petition for recall and resentencing on this ground.

II.

*Denying Juvenile Offenders Like Heard Who Were Sentenced to the Functional Equivalent of Life Without Parole the Opportunity to Petition for Resentencing Violates the Constitutional Guarantee of Equal Protection*

Heard contends that if section 1170, subdivision (d)(1), is not interpreted to apply to defendants sentenced to the functional equivalent of life without parole, then it violates his constitutional right to equal protection of the laws. On this, we agree.

The People argue that Heard forfeited the opportunity to raise his equal protection challenge on appeal because he failed to assert it in the trial court. It is true that an equal protection claim "may be forfeited if it is raised

23

for the first time on appeal." (*People v. Dunley* (2016) 247 Cal.App.4th 1438, 1447.)  But "application of the forfeiture rule is not automatic." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)  "[A]ppellate courts have discretion to address constitutional issues raised on appeal" where, as here, "the issue presented is 'a pure question of law' turning on undisputed facts." (*In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1323; see *In re Sheena K.* (2007) 40 Cal.4th 875, 888 [defendant's challenge to a probation condition as constitutionally vague and overbroad presented a pure question of law that could be considered for the first time on review]; *People v. Blanco* (1992) 10 Cal.App.4th 1167, 1172–1173 [whether to address the constitutionality of a statute for the first time on appeal is a discretionary determination for the reviewing court].)  One factor that supports overlooking a forfeiture is when the belatedly raised issue "may return as a habeas corpus petition" (*In re Spencer S.*, at p. 1323), which could occur here (see *In re Jones* (2019) 42 Cal.App.5th 477, 480 [habeas petition challenging denial of resentencing under section 1170, former subdivision (d)(2)]).  We also observe that section 1170, subdivision (d)(10), allows the filing of successive resentencing petitions, so Heard could conceivably raise his equal protection challenge in a later petition if we do not consider it now.  So we will exercise our discretion to consider the merits of Heard's equal protection claim.

A.    *Heard Is Similarly Situated With the Juvenile Offenders Eligible to Seek Resentencing Under Section 1170, Subdivision (d)(1)*

"The Fourteenth Amendment to the United States Constitution and article I, section 7, subdivision (a) of the California Constitution both prohibit the denial of equal protection of the laws.  'The equal protection guarantees of [both Constitutions] are substantially equivalent and analyzed in a similar fashion.' " (*People v. Cruz* (2012) 207 Cal.App.4th 664, 674.)  "The concept of equal protection recognizes that persons who are similarly situated with

24

respect to a law's legitimate purposes must be treated equally." (*People v. Brown* (2012) 54 Cal.4th 314, 328.)

When we are presented with an equal protection claim, we begin by considering whether the class of persons allegedly subjected to unequal treatment is similarly situated with the class of persons benefited by the challenged law. " ' "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' " (*People v. Morales* (2016) 63 Cal.4th 399, 408 (*Morales*).) Indeed, "[t]here is always some difference between the two groups which a law treats in an unequal manner since an equal protection claim necessarily asserts that the law in some way distinguishes between the two groups." (*People v. Nguyen* (1997) 54 Cal.App.4th 705, 714.)

Heard protests the fact that juvenile offenders sentenced to an explicitly designated life without parole term can seek resentencing while juvenile offenders sentenced to the functional equivalent of such a sentence cannot. As we have already explained, section 1170, subdivision (d)(1)(A), establishes the threshold eligibility requirements to petition for recall and resentencing. Its only criteria are (1) the defendant "was under 18 years of age at the time of the commission of the offense"; (2) for this offense, the defendant "was sentenced to imprisonment for life without the possibility of parole"; and (3) the defendant "has been incarcerated for at least 15 years." (§ 1170, subd. (d)(1)(A).) If the defendant meets these requirements, he "may submit to the sentencing court a petition for recall and resentencing." (*Ibid.*) Heard meets the first and third criteria; in this regard, he is identically

situated with those who are eligible to petition for resentencing. The only difference between him and the defendants to whom this provision applies is that he was sentenced to 23 years plus 80 years to life, rather than life without parole.

Heard argues his sentence constitutes a de facto life without parole sentence and he is thus similarly situated with juveniles sentenced to an explicit term of life without parole. He acknowledges that due to the enactment of section 3051, he will now receive a youth offender parole hearing in his 25th year of incarceration, but points out that following the 2018 amendment of section 3051, juveniles sentenced to an explicit term of life without parole are also entitled to a youth offender parole hearing in their 25th year of incarceration. (Stats. 2017, ch. 684 § 1.5; see § 3051, subd. (b)(3), (4).)

The People disagree that Heard's sentence qualifies as a de facto life without parole sentence. Citing *Franklin*, *supra*, 63 Cal.4th at page 286, they contend section 3051 has " 'reformed' " Heard's sentence so that it is no longer the functional equivalent of life without parole. The People additionally argue that "irrespective of section 3051," Heard is not similarly situated with juvenile offenders sentenced to an explicit term of life without parole. The difference, they claim, is in the crimes committed by each group of offenders.

Here, we conclude Heard is similarly situated for purposes of section 1170, subdivision (d)(1)(A), with those juvenile offenders who are eligible to petition for resentencing. First, we disagree that Heard's eligibility for a youth offender parole hearing under section 3051 undermines the conclusion that his sentence constitutes a de facto life without parole sentence, such that he is not similarly situated with the juvenile offenders to whom the resentencing provision applies. As another court has explained, the statutory

26

resentencing provision "uses the phrase '*was sentenced*' and refers to the past." (See *People v. Lopez* (2016) 4 Cal.App.5th 649, 653–654, italics added (*Lopez*) [holding that two juveniles, whose life without parole sentences were modified to life with parole in response to a habeas petition, asserting Eighth Amendment error remained eligible to seek resentencing under section 1170, former subdivision (d)(2)(A)(i), because they were originally sentenced to life without parole].) At the time Heard was sentenced, section 3051 had not yet been enacted, and he was required to serve his determinate term plus the full minimum period of confinement of each of his life sentences before becoming parole eligible. (§§ 669, subd. (a), 3046, subd. (b).) Put another way, Heard would have to serve 103 years before becoming parole eligible. Such a sentence constitutes a de facto life without parole sentence. (See *Caballero*, *supra*, 55 Cal.4th at p. 268 [offender who would not become parole eligible for more than 100 years was sentenced to the functional equivalent of life without parole].)

It is true, as the People contend, that *Franklin* held that because the defendant had become eligible for a youth offender parole hearing in his 25th year of incarceration, he was no longer serving a life without parole sentence or its functional equivalent. (*Franklin*, *supra*, 63 Cal.4th at pp. 279–280.) As our high court explained, this was the result of the retroactive operation of section 3051. (*Franklin*, at pp. 278–279.) The Court further explained, however, that section 3051 did not alter the defendant's original sentence, which continued to remain binding. (*Franklin*, at pp. 279–280.) Applying the same reasoning here, although the retroactive operation of section 3051 means Heard will receive a youth offender parole hearing in his 25th year of incarceration, his original sentence remains binding. Section 1170, subdivision (d)(1), is a statutory resentencing opportunity, not a cure for

27

*Miller* error. (*Kirchner*, *supra*, 2 Cal.5th at p. 1056.) Although under *Franklin*, Heard's sentence as it currently operates is no longer the functional equivalent of life without parole, this does not change the fact that the sentence *was* a de facto life without parole sentence at the time it was imposed. Because section 1170, subdivision (d)(1)(A), refers to the "offense for which the defendant *was sentenced* to imprisonment for life without the possibility of parole" (italics added), and Heard was sentenced to the functional equivalent of a life without parole sentence, he is similarly situated with the juvenile offenders whose sentences make them eligible to seek resentencing.

As for the People's claim that the crimes committed by the juvenile offenders eligible to petition for resentencing are different from the crimes committed by those who cannot seek resentencing, we do not find this distinction is relevant. The People rely on *People v. Sanchez* (2020) 48 Cal.App.5th 914, 920 (*Sanchez*), which involved an equal protection challenge to former section 1170.95.[14] At that time, former section 1170.95 provided that "[a] person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts" if certain specified conditions were met. (See *Sanchez*, at p. 918; former § 1170.95, subd. (a), added by Stats. 2018, ch. 1015, § 4.) The defendant in *Sanchez* was convicted of voluntary manslaughter based on an incident in which he and fellow gang members yelled at a rival gang member and the defendant's fellow gang

---

14     Former section 1170.95 has since been amended and renumbered as section 1172.6. (Stats. 2021, ch. 551, § 2 [amended, effective Jan. 1, 2022]; Stats. 2022, ch. 58, § 10 [amended and renumbered, effective June 30, 2022].)

members assaulted the rival, causing him to smash his head on the pavement. (*Sanchez*, at p. 916.) He argued that former section 1170.95 violated equal protection by granting relief to defendants convicted of felony murder or murder under a natural and probable consequences theory, but not to defendants convicted of voluntary manslaughter. (*Sanchez*, at p. 917.)

The appellate court disagreed. It explained that former section 1170.95 was enacted in conjunction with legislation that "amend[ed] sections 188 and 189 to restrict the scope of first-degree felony murder and to eliminate murder liability based on the natural and probable consequences doctrine," and "create[d] a procedure for offenders previously convicted of felony murder or murder under a natural and probable consequences theory to obtain the benefits of these changes retrospectively." (*Sanchez*, *supra*, 48 Cal.App.5th at p. 917.) The court found the defendant was not similarly situated with those the law was intended to benefit, because he "was 'convicted of voluntary manslaughter, a different crime from murder, which carries a different punishment' " and because "[i]n general, 'offenders who commit different crimes are not similarly situated.' " (*Id.* at p. 920.)

The People's reliance on *Sanchez* is misplaced. The equal protection inquiry focuses on whether two groups of people are similarly situated " ' "*for purposes of the law challenged.*" ' " (*Morales*, *supra*, 63 Cal.4th at p. 408, italics added.) Unlike former section 1170.95, the resentencing provision currently codified at section 1170, subdivision (d)(1), was not enacted in conjunction with legislation that narrowed the scope of theories available to support particular homicide offenses, and its purpose was not to create a procedure for vacating convictions. In stark contrast to former section 1170.95, section 1170, subdivision (d)(1), does not make the defendant's conviction of a particular offense a requirement for seeking resentencing.

(See § 1170, subd. (d)(1)(A).) In short, *Sanchez* involved a different ameliorative law with a different purpose and different requirements than the provision at issue in this case. The *Sanchez* court's reasons for finding the defendant convicted of voluntary manslaughter insufficiently similar to the defendants eligible for relief under former section 1170.95 simply do not apply here.

We conclude that for purposes of section 1170, subdivision (d)(1)(A), Heard is similarly situated with those defendants who are eligible to petition for resentencing.

B. *The Resentencing Provision's Differential Treatment of Juvenile Offenders Sentenced to Life Without Parole and Juvenile Offenders Sentenced to the Functional Equivalent of Life Without Parole Fails Rational Basis Scrutiny*

Next, we must consider whether the disparate treatment of the two categories of juvenile offenders is constitutionally justified. Both sides contend we should answer this question by applying the rational basis test. We agree. "Where a class of criminal defendants is similarly situated to another class of defendants who are sentenced differently, courts look to determine whether there is a rational basis for the difference." (*People v. Edwards* (2019) 34 Cal.App.5th 183, 195.) " 'This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve.' " (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881.) " 'While the realities of the subject matter cannot be completely ignored [citation], a court may engage in " 'rational speculation' " as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review "whether or not" any such speculation has "a foundation in the record." ' [Citation.] To mount a successful rational basis challenge, a party must ' "negative every conceivable basis" ' that might support the disputed

30

statutory disparity." (*Ibid.*) "If a plausible basis exists for the disparity, courts may not second guess its ' "wisdom, fairness, or logic." ' " (*Ibid.*)

Heard contends there is no rational basis for making juvenile offenders sentenced to explicit terms of life without parole eligible for resentencing under section 1170, subdivision (d)(1), while denying the same opportunity to juvenile offenders sentenced to terms that amount to the functional equivalent of life without parole. We agree. The resentencing provision has been called "a legislative 'act of lenity' designed to permit defendants to secure a 'modification downward' of their sentences." (*People v. Gibson* (2016) 2 Cal.App.5th 315, 327.) Though apparently initially conceived as a means for reducing the sentence of a juvenile offender sentenced to life without parole to one that provided an opportunity for parole,[15] section 3051,

---

[15] When a recall petition filed under the authority of section 1170, subdivision (d)(1), is granted, the sentencing court has "the discretion . . . to resentence the defendant in the same manner as if the defendant had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1170, subd. (d)(7).) Such provisions have been held to give the resentencing court "jurisdiction to modify *every* aspect of the sentence, and not just the portion subjected to the recall. [Citations.] In this situation, . . . the resentencing court may consider 'any pertinent circumstances which have arisen since the prior sentence was imposed.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893 [discussing recall of sentence under section 1170, former subdivision (d)]; see *Dix v. Superior Court* (1991) 53 Cal.3d 442, 458 [observing that section 1170, former subdivision (d) allowed the trial court, on its own motion, within 120 days of the date of commitment, to " 'recall the sentence and commitment [previously ordered] and resentence the defendant in the same manner as if the defendant had not been sentenced previously' "].) In *Lopez, supra,* 4 Cal.App.5th at pages 652 to 653, two juveniles initially sentenced to life without parole were each placed on five years of probation after the trial court granted their petitions for resentencing. As this example reveals, the benefit provided by section 1170, subdivision (d)(1), can extend beyond resentencing the offender to a term that includes the possibility of parole.

subdivision (b)(4), now largely fulfills that purpose. (See § 3051, subd. (b)(4).) Even so, the resentencing provision remains operative and available to offenders sentenced to explicit life without parole terms.

We can conceive of no legitimate reason for making juvenile offenders sentenced to explicit life without parole terms eligible to seek resentencing but not juvenile offenders sentenced to the equivalent of a life without parole sentence. Both groups, subject to limited exceptions, are now eligible for youth offender parole hearings.[16] Heard will receive his youth offender parole hearing after 25 years of incarceration; so will a juvenile offender sentenced to an explicit term of life without parole. (§ 3051, subd. (b)(3), (4).) And yet only the latter group is permitted to petition for resentencing.

The People's sole justification for the differential treatment is that the Legislature "could have reasonably concluded that the punishment of [life without parole] imposed on those under age 18 could be excessive and this was an appropriate means of reform by allowing for reconsideration of such a sentence." But as Heard points out, the same concern applies equally to juveniles sentenced to the functional equivalent of life without parole.

Nor can the differential treatment be justified by differences in the relative culpability of each group. The United States Supreme Court, in addressing the justifications for juvenile punishment, has recognized that a criminal sentence must relate to the culpability of the offender. (See *Graham*, *supra*, 560 U.S. at p. 71.) Resentencing under section 1170,

---

16    The Legislature has excluded from relief under section 3051 juvenile offenders sentenced under the Three Strikes Law or the "One Strike" sex offender law. (See § 3051, subd. (h) [stating section 3051 "shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, or Section 667.61"].)

subdivision (d)(1), is available to juvenile offenders convicted of first degree murder whose cases involve a special circumstances finding. (See § 190.5, subd. (b).) Special circumstances murders are considered "the most heinous acts" proscribed by law. (*In re Nunez* (2009) 173 Cal.App.4th 709, 728.) They are "more severe and more deserving of lifetime punishment than nonspecial circumstance first degree murder." (*In re Williams* (2020) 57 Cal.App.5th 427, 436.) By contrast, " 'defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers. . . . Although an offense like robbery or rape is "a serious crime deserving serious punishment," those crimes differ from homicide crimes in a moral sense.' " (*Contreras, supra,* 4 Cal.5th at p. 382, quoting *Graham*, at p. 69.) Section 1170, subdivision (d)(1), thus has the incongruous effect of extending sentencing leniency exclusively to the category of offenders generally regarded as the least deserving of it. (See *Contreras*, at p. 382 [observing that section 3051, by making juveniles convicted of special circumstances murder eligible for youth offender parole hearings while denying youth offender parole hearings to juvenile One Strike sex offenders, has the "anomalous" effect of "treat[ing] a nonhomicide offense more harshly than special circumstance murder"].) The gravity of the crimes committed by the two groups of juvenile offenders thus fails to explain their differential treatment.

We have also considered whether the Legislature might have viewed a juvenile offender whose multiple offenses cause him to receive a lengthy term-of-years sentence as more culpable, and more deserving of severe punishment, than an offender who commits a single, albeit more serious offense. However, even if one accepts this as a logical premise, it fails when one considers how section 1170, subdivision (d)(1), operates. Although

33

section 1170, subdivision (d)(1), makes a juvenile offender sentenced to an explicit life without parole term eligible to petition for resentencing, nothing in the provision precludes a juvenile who receives that same sentence *plus additional terms imposed for additional offenses or enhancements* from petitioning for resentencing. The number of offenses theoretically committed by each group of offenders also fails to justify their disparate treatment.

In sum, we are unable to identify a rational basis for making juveniles sentenced to an explicitly designated life without parole term, but not juveniles sentenced to the functional equivalent of life without parole, eligible to petition for resentencing under section 1170, subdivision (d)(1). As a consequence, denying Heard the opportunity to petition for resentencing under this provision violates his right to equal protection of the laws.[17]

We will therefore reverse the trial court's order denying Heard's petition for recall and resentencing on the ground that his sentence rendered him ineligible to petition for resentencing. Because the trial court denied Heard's petition on this ground, it did not consider the merits of the petition.

---

[17] Heard's equal protection claim appears to embrace the position—a position the People do not address—that the canon of constitutional avoidance requires us to construe section 1170, subdivision (d)(1)(A), to avoid this equal protection violation. To the extent Heard advances this argument, we reject it. The canon of constitutional avoidance applies when a statute " ' "is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part[.]" ' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1373.) It "is a tool for choosing between competing plausible interpretations of a statutory text" (*Clark v. Suarez Martinez* (2005) 543 U.S. 371, 381), "not a method of adjudicating constitutional questions by other means" (*ibid.*). As we have concluded, section 1170, subdivision (d)(1)(A), cannot plausibly be interpreted to apply to juvenile offenders who were not sentenced to an explicitly designated life without parole term. For this reason, the canon of constitutional avoidance does not apply.

(See § 1170, subd. (d)(5) [requiring the court to determine whether, "by a preponderance of the evidence that one or more of the statements specified in subparagraphs (A) to (D), inclusive, of paragraph (2) is true"].) Upon remand, the court must consider the merits of the petition and proceed in accordance with section 1170, subdivision (d)(1)'s directives. We express no opinion on the outcome of that proceeding.

## DISPOSITION

The June 28, 2021 order denying Heard's petition for recall of sentence and resentencing is reversed. The matter is remanded to the trial court for further proceedings in accordance with this opinion.

DO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


IRION, J.

35